STATE OF NORTH CAROLINA v. LAWRENCE McCALL

No. 10

(Filed 6 April 1976)

**1. Homicide § 21— first degree murder — sufficiency of evidence**

The State's evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of first degree murder where it tended to show: the victim died as a result of gunshot wounds inflicted by a shot fired from a house trailer some 80 feet away; a short time before the shooting, defendant had test fired a 12 gauge shotgun; 12 gauge shotgun wadding was found in a straight line between the trailer and bodies after the shooting; a freshly fired 12 gauge shotgun was later found in defendant's house hidden between the quilts and mattress of a bed; defendant was the only person in the trailer when the fatal shots were fired; defendant attempted to run down the victim with a car shortly before the shooting; defendant had driven back and forth by the victim before the killing; defendant fired a second shot after two others also wounded by the first shot were able to rise; and defendant left the scene hurriedly after the shooting without offering any assistance.

**2. Criminal Law §§ 102, 170— jury argument invited by opposing counsel — harmless error**

Jury argument by the district attorney in which he repeatedly referred to the fact that defense counsel was from another area of the State was invited by defense counsel's jury argument severely attacking the credibility of two State's witnesses and the honesty of local law enforcement officers and did not constitute prejudicial error.

**3. Homicide § 24— presumptions of malice and unlawfulness — Mullaney decision**

The trial court's instruction in a first degree murder case on the presumptions of malice and unlawfulness arising upon proof of a killing by the intentional use of a deadly weapon does not contravene the decision of *Mullaney v. Wilbur,* 421 U.S. 684; furthermore, the *Mullaney* decision is not retroactive and does not apply to the trial of defendant held before that decision was rendered.

4. **Constitutional Law § 36; Homicide § 31— constitutionality of death penalty**

The death penalty for first degree murder is not unconstitutional.

APPEAL by defendant pursuant to G.S. 7A-27(a) from *Fountain, J.*, at the 2 June 1975 Special Criminal Session of TRANSYLVANIA Superior Court.

On separate indictments, proper in form, defendant was charged with the first degree murder of Ruth Looker Hice and Billy Derwood Hice. The jury found defendant guilty as charged in the death of Ruth Looker Hice, and a sentence of death was imposed. The jury was unable to agree on a verdict in the case charging the murder of Billy Hice. A juror was withdrawn and a mistrial declared in that case.

Defendant had been previously convicted of both murders before Martin, J., at the 1 February 1974 Regular Criminal Session of Transylvania Superior Court. However, defendant was granted a new trial in both cases by this Court in a decision reported in 286 N.C. 472, 212 S.E. 2d 132 (1975).

The evidence for the State at the new trial tended to show the following: On 12 September 1973 the decedents, Billy Derwood Hice (Billy) and Ruth Looker Hice (Ruth), lived in a trailer home on the north bank of the French Broad River in the Transylvania County community of Balsam Grove. Lloyd McCall and his son Gary McCall also lived in house trailers along the north bank and near the Hices. State Highway 215 ran parallel to the south bank of the river and the only method of ingress to and egress from the Hices' and McCalls' property was by way of a concrete bridge, built by Hice, that crossed the river and intersected with Highway 215. On the date in question, Mr. and Mrs. Melvin Owens lived on the south side of the river, directly across from Gary McCall's trailer. Mr. Owens was the father-in-law of Lloyd McCall and the grandfather of Lloyd's son Gary. Defendant and Lloyd McCall are brothers.

Mr. Owens testified as follows: He first saw defendant on the day of the shooting at approximately 8:00 a.m. when defendant left the trailer of his brother Lloyd and drove down Highway 215. Defendant was next seen at approximately 12:00 p.m. when he returned to his brother's trailer. About 2:30 p.m., defendant drove his Mustang down to Gary's trailer nearer the river. From their front porch the Owenses observed defendant come out from behind Gary's trailer with a shotgun in his

hand and fire it into the air. The force of the discharge "backed him up between two and three steps" and Mr. Owens began laughing "about that gun a kicking Lawrence."

At this time Billy was attempting to install a swinging gate at the end of the concrete bridge on the north side of the river. Shortly after defendant fired the shotgun, Billy returned to his trailer for some additional materials for the gate. Defendant then left Gary's trailer and drove down Highway 215. Later, both Billy and Ruth again began to work on the gate. While they were doing so, defendant drove up and down the highway past the bridge six or eight times, the last time driving out onto the bridge and watching the Hices work. Defendant then backed off the bridge and went down the highway.

Mr. Owens started to walk down to the bridge to talk with the Hices when he saw defendant reappear down the highway, driving at a high rate of speed. He swerved at Mr. Owens and drove onto the bridge. The Hices threw up their hands in an effort to stop him but defendant's car "butted them backwards," knocking Ruth down. Defendant then parked at Gary's trailer and went in the front door. Mr. Owens joined the Hices at the gate at which time he saw Lloyd and Gary McCall approximately 550 to 600 feet from Gary's trailer. Almost immediately a shot rang out, wounding Billy and Mr. Owens and killing Ruth. Mr. Owens suffered a head wound but managed to make it across the bridge to his home. On his way across the bridge, he heard another shot and saw that it came from Gary's trailer. This shot hit Billy as he bent over Ruth.

Mr. Owens received first aid from his wife and subsequently was able to get in his pickup truck and go for help. After he left, Mrs. Owens went back into the house where she began watching the bridge and adjacent area. She observed defendant leave Gary's trailer almost immediately and drive without stopping past the two bodies, across the bridge and onto the road.

On cross-examination of Mr. and Mrs. Owens, the defense elicited that Lloyd and Gary McCall were on bad terms with the Hices over a boundary dispute, that Mr. Owens felt animosity toward defendant, who was his former son-in-law, and that Mr. and Mrs. Owens had made conflicting remarks about who had done the shooting shortly after the incident.

Dr. George Lacey, an expert in the field of pathology, testified that Ruth died as a result of gunshot wounds in the chest, perforating the right lung, and that Billy died as a result of a gunshot wound, perforating the heart.

State Trooper Zeb Hawes, the first law enforcement officer to arrive on the scene, testified that he found the Hices' bodies lying approximately twenty feet from the end of the bridge, and that he saw two vehicles parked nearby with dents in their sides, apparently from the impact of shotgun pellets.

During a search of the area, the officers found some "shotgun wadding" approximately twenty-four feet from Gary's trailer and in a straight line between the trailer and the bodies. Another small piece of wadding was found on the inside windowsill of the trailer. The window screen of the window nearest the Hices on the north end of the trailer had been partially torn down and had a hole through it. After obtaining a search warrant, the officers searched the trailer and found powder markings around the hole in the screen. Three 12 gauge shotgun shells were found in a dresser drawer. A rifle and a 20 gauge shotgun were also found in the trailer. Near the trailer where Mr. Owens saw defendant fire a shotgun, the officers found an empty 12 gauge shotgun shell.

Defendant was arrested at approximately 2:30 a.m. on 13 September 1973. A search of the house in which defendant was staying revealed a 12 gauge shotgun hidden between the quilts and the mattress of a bed. The shotgun smelled of fresh powder burns. After being taken into custody, defendant was found to have a large bruise on the biceps of his left arm.

SBI Agent F. G. Satterfield, Jr., an expert in the field of firearms identification, identified the pieces of wadding found around Gary's trailer as 12 gauge shotgun wadding. He further testified that the 12 gauge shotgun found at defendant's home had fired the empty shotgun shell found near the trailer and that when he test fired that shotgun at the test range in Raleigh, the "kick" of the gun produced a slight bruise on his shoulder.

The State rested and the defendant offered evidence tending to show the following: Mr. Owens made a statement to SBI Agent Charles Chambers on the day of the shooting in which he stated that either Lloyd or Lawrence McCall had done the shooting. Mrs. Owens' statement on the same day described prior animosity between Lloyd and the Hices over the bridge.

Debbie Williams, Gail Enloe, Mike McCall and Phillip Owens, all of whom arrived at the scene shortly after the shooting, each heard Mrs. Owens state that Lloyd had killed the Hices and that Gary had tried to stop him.

The defense then rested and the State offered rebuttal testimony tending to show that neither Gary nor Lloyd McCall was in or near Gary's trailer at the time of the shooting.

Other facts pertinent to decision will be set out in the opinion.

*Attorney General Rufus L. Edmisten, Special Deputy Attorney General Edwin M. Speas, Jr., and Associate Attorney Joan H. Byers for the State.*

*Ransdell & Ransdell by W. G. Ransdell, Jr., for defendant appellant.*

MOORE, Justice.

[1]   Defendant first assigns as error the denial of his motions for judgment as of nonsuit at the close of the State's evidence and at the close of all the evidence. Defendant contends that the evidence tending to show that defendant murdered Mrs. Hice was insufficient to be submitted to the jury. Upon considering a motion for nonsuit, the court must find that there is "substantial evidence . . . both that an offense charged . . . has been committed and that the defendant committed it" before such motion can be overruled. *State v. Cutler,* 271 N.C. 379, 383, 156 S.E. 2d 679, 682 (1967). *See* 2 Strong, N. C. Index 2d, Criminal Law, §§ 104 and 106. The evidence for the State, considered in the light most favorable to it, is deemed to be true and the State is entitled to the benefit of all inferences which may reasonably be drawn therefrom. *State v. Price,* 280 N.C. 154, 184 S.E. 2d 866 (1971); *State v. Roseman,* 279 N.C. 573, 184 S.E. 2d 289 (1971); *State v. Cutler, supra.*

The State's evidence in this case tends to show that Mrs. Hice died as a result of gunshot wounds inflicted by a shot fired from Gary McCall's trailer some eighty feet away. The State's evidence further tends to show that defendant, a short time before the shooting, had test fired a 12 gauge shotgun, that 12 gauge shotgun wadding was found in a straight line between the trailer and the bodies after the shooting, and that a freshly-fired 12 gauge shotgun was later found in defendant's house

hidden between the quilts and mattress of a bed. The State also produced evidence tending to show that defendant was the only person in Gary McCall's trailer when the fatal shots were fired.

Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. *State v. Duboise,* 279 N.C. 73, 181 S.E. 2d 393 (1971); *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970); *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652 (1969); G.S. 14-17.

The killing of Mrs. Hice with a deadly weapon, when established beyond a reasonable doubt, raises two presumptions: first, that the killing was unlawful, and second, that it was done with malice. *State v. Williams,* 288 N.C. 680, 220 S.E. 2d 558 (1975); *State v. Hankerson,* 288 N.C. 632, 220 S.E. 2d 575 (1975); *State v. Rummage,* 280 N.C. 51, 185 S.E. 2d 221 (1971). Indeed, actual ill will can be inferred from defendant's attempt to run down deceased shortly before the shooting.

Premeditation and deliberation can be inferred from defendant's (1) obtaining and test firing the weapon before the fatal shooting, (2) driving back and forth by the victims before the killing, (3) shooting the unsuspecting victims from ambush some eighty feet away, (4) firing the second shot after two of those wounded by the first shot were able to rise, and (5) leaving the scene hurriedly and passing the wounded victims immediately after the shooting without offering assistance. Thus, there was ample evidence tending to show that the crime of murder in the first degree was committed and that defendant committed it. Contradictions and discrepancies, even in the State's evidence, are for the jury to resolve and do not warrant nonsuit. *State v. Mabry,* 269 N.C. 293, 152 S.E. 2d 112 (1967); 2 Strong, N. C. Index 2d, Criminal Law § 104, and cases therein cited. The motions for judgment as of nonsuit were properly overruled.

[2] By his next assignment of error, defendant insists that the trial court erred in permitting the district attorney to make an argument to the jury "which tended to belittle, demean and ridicule appellant's counsel for the apparent purpose of diminishing counsel's effectiveness." Defendant claims this argument denied him due process and the effective assistance of counsel guaranteed by the Constitution of North Carolina and the Constitution of the United States.

The remarks complained of followed the following arguments of defense counsel:

"(1) 'The prosecution is in a box. Mr. Lowe [the District Attorney] is boxed in.' Law enforcement officers are in a bind. Whole law enforcement and District Attorney office have their hands tied.

(2) 'I am talking bad about Melvin and Flora Owens because I think they are bad people. I wish that Melvin Owens had remained seated in the courtroom during my argument because I wanted to call him a liar to his face.'

(3) 'I have tried a lots of murder cases and I haven't seen a single murder case where there was not a motive involved. There is no motive for Lawrence McCall to kill the Hice's.'

(4) 'Members of the jury I ask you to come back into the Courtroom after your deliberation and look Melvin and Flora Owens in the eye and say; Not Guilty.'

(5) 'Melvin Owens a Minister of the Gospel. I can't believe it. There is a bad apple in every barrel. I don't want him telling me how to live.'

(6) 'Lawrence McCall is going to walk out of this courtroom a free man.'

(7) 'Thank you for your attention this week and we demand of you a verdict of Not Guilty.' "

A review of the comments of the district attorney reveals that they were made in response to the above attacks by defense counsel on the credibility of the Owenses and the law enforcement officers in Transylvania County. Excerpts from the district attorney's comments are as follows:

"You know what Mr. Ransdell did? He made light of Mr. Melvin Owen's religion. He made light of his religion. Now, I'm sorry he did that. You know, we all have our own beliefs and we all look at religion with—most of us are different denominations. I'm a Baptist and I'm proud to be a Baptist. But you know every man has his right to his belief in God. And every man doesn't have an engraved certificate showing that he's been ordained as a minister. Maybe they have golden engraved certificates down in Raleigh where Mr. Ransdell comes from, showing that some

man is the pastor of the First Baptist Church of the big city of Raleigh. . . . [H]e stood right here in the courtroom and looked out there and said, 'Mr. Melvin Owens is a liar,' and I resent anybody coming into Transylvania County when he doesn't even know the county and doesn't know the citizens of this county.

Listen, I been in this county seventeen years, and if I was going to prove a man's character I wouldn't come all the way from Raleigh to call him a liar. . . .

. . . You show me one citizen in Transylvania County that took the oath on the Holy Bible and said Mrs. Flora Owens wasn't worthy of belief. The only person that's said that is the man from Raleigh, North Carolina, big city of Raleigh.

. . . You ought to be proud of your law enforcement officers here. I don't know how they do it down in Raleigh where Mr. Ransdell's from, you know, that big city. But I want to say this, I'm proud of the officers in Transylvania County.

. . . Now, let me talk about guns. Let me tell you something. You talk about how they do it down in Raleigh. Here's what your officer did.

. . . He broke the one he got out of Lawrence's house. He broke the guns down that he got out of the trailer, and don't you know that Hubert Brown would have told you that they smelled of gun powder if they did?

OBJECTION.     OVERRULED.

I'm sure he objects to it.

THE COURT: Well, now don't argue about that.

I apologize to the Court.

THE COURT: Well, I want to make it clear that he's entitled to object when he thinks it's appropriate and I'll make such rulings as I think appropriate."

It is well established that the control of the arguments of counsel must be left largely in the sound discretion of the trial judge with wide latitude given counsel to argue all the law and the facts presented by the evidence and all reasonable inferences therefrom. *State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125

(1975); *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974); *State v. Thompson,* 278 N.C. 277, 179 S.E. 2d 315 (1971); *State v. Graves,* 252 N.C. 779, 114 S.E. 2d 770 (1960). It should also be noted that none of the remarks of the district attorney quoted above, with the exception of the last exchange, were objected to in apt time by defense counsel. An objection after verdict ordinarily comes too late. *State v. Noell, supra; State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970). We hold, however, that even if properly objected to, the arguments of the district attorney were not so prejudicial as to require a new trial. Defense counsel is in fact from Raleigh and in our opinion his remarks invited the response of the district attorney. This Court has disapproved the type of argument made by defense counsel. In *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335 (1967), we stated that "[i]t is improper for a lawyer in his argument to assert his opinion that a witness is lying. He can argue to the jury that they should not believe a witness, but he should not call him a liar."

Defense counsel severely attacked the credibility of the two State's witnesses, Mr. and Mrs. Owens, and the honesty of the local law enforcement officers. The district attorney answered by attempting to restore the credibility of these witnesses and to defend the performance of the investigating officers. Mr. Ransdell opened the door with abusive comments. The response he received was justified. *State v. Stegmann,* 286 N.C. 638, 654, 213 S.E. 2d 262, 274 (1975); *State v. Seipel,* 252 N.C. 335, 113 S.E. 2d 432 (1960). This assignment of error is overruled.

[3] The trial court in its charge to the jury placed the burden upon the State to prove defendant's guilt beyond a reasonable doubt. The court further charged:

> " . . . [W]here it is shown that a person intentionally, with the use of a deadly weapon, kills another, nothing else appearing, two presumptions arise. First, that . . . the killing was unlawful, and second, that it was done with malice. And an unlawful killing with malice is murder in the second degree. And if the State can show that from the evidence and beyond a reasonable doubt, and further show from the evidence and beyond a reasonable doubt that the killing resulted from . . . premeditation and deliberation, then it becomes murder in the first degree."

Defendant challenges this portion of the charge, contending that it contravenes the holding in the recent case of *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881 (1975), that the burden of proving every element of a crime beyond a reasonable doubt rests on the State.

Defendant was sentenced to death for the murder of Mrs. Hice on 7 June 1975. The date of the *Mullaney* decision was 9 June 1975. Therefore, *Mullaney* does not control unless it is to be applied retroactively. This Court has recently held that *Mullaney* will not be given retroactive effect insofar as North Carolina cases are concerned. *State v. Hankerson, supra.* Therefore, defendant's challenge based on *Mullaney* is without merit.

Even if *Mullaney* should later be found to be retroactive, *Mullaney* does not invalidate the use of the presumptions of unlawful killing and malice in the present case. In *State v. Williams*, 288 N.C. 680, 220 S.E. 2d 558 (1975), Justice Branch addressed the issue of whether the presumptions of malice and unlawfulness must fall after *Mullaney*. In holding that they do not, Justice Branch, speaking for the Court, stated:

> "We are of the opinion that when the State proves beyond a reasonable doubt that an accused intentionally inflicted a wound with a deadly weapon proximately causing death, such basic facts are sufficient to meet the most stringent of the standards of due process recognized by the [United States Supreme] Court. Establishment of the presumption requires the triers of fact to conclude that the prosecution has met its burden of proof with respect to the presumed fact by having established the required basic facts beyond a reasonable doubt. This does not shift the ultimate burden of proof from the State but actually only shifts the burden of going forward so that the defendant must present some evidence contesting the facts presumed. We, therefore, hold that the presumptions here challenged comport with due process. [Citations omitted.]

> \*     \*     \*

> " . . . We find nothing in *Mullaney* which declares that due process is violated by a rule which allows rational and natural presumptions or inferences to arise when certain facts are proved beyond a reasonable doubt by the State."

The evidence in present case was sufficient to permit the jury to find beyond a reasonable doubt that defendant intentionally fired the shots that killed Mrs. Hice, thereby raising the presumed facts of malice and unlawfulness. Defendant then was faced with the burden of going forward with some evidence to contest the facts presumed, which he failed to do. This assignment of error is overruled.

[4] Finally, defendant challenges the constitutionality of North Carolina's death penalty. Questions raised by this assignment of error have been considered and found to be without merit in *State v. Armstrong,* 287 N.C. 60, 212 S.E. 2d 894 (1975); *State v. Vick,* 287 N.C. 37, 213 S.E. 2d 335 (1975); *State v. Lowery,* 286 N.C. 698, 213 S.E. 2d 255 (1975); *State v. Simmons,* 286 N.C. 681, 213 S.E. 2d 280 (1975); *State v. Stegmann, supra; State v. Woods,* 286 N.C. 612, 213 S.E. 2d 214 (1975); *State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975); *State v. Lampkins,* 286 N.C. 497, 212 S.E. 2d 106 (1975); *State v. Avery,* 286 N.C. 459, 212 S.E. 2d 142 (1975); *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975); *State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712 (1974); *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844 (1974); *State v. Dillard,* 285 N.C. 72, 203 S.E. 2d 6 (1974); *State v. Noell, supra; State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974). We adhere to those decisions.

In view of the seriousness of the charge, we have carefully examined each of defendant's assignments of error. Our examination of the entire record discloses that defendant has had a fair trial, free from prejudicial error.

No error.